# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**UNITED STATES OF AMERICA**

        **Plaintiff,**

**v.**                             **Case No. 06-20078-01-JWL**

**JASON McKINNEY,**

        **Defendant.**

## MEMORANDUM AND ORDER

The superceding indictment in this case (doc. 2) charges defendant Jason McKinney with five counts related to Mr. McKinney's alleged possession of crack cocaine with intent to distribute and possession of a firearm. This matter is before the court on his motion and amended motion to suppress evidence (docs. 25 and 27). For the reasons set forth below, the motions are denied

## I.   Factual Findings

On January 4, 2007, the court held an evidentiary hearing on this matter. The government presented the testimony of three witnesses employed with the Leavenworth Police Department: Officer Kevin Metzgar, Sergeant James Bridges, and Officer Ryan Parker. Mr. McKinney presented testimony from Cecil Newsom, who resides at 1811 Fourth Avenue in Leavenworth, Kansas.

According to Officer Metzgar, on May 15, 2006, at approximately 11:46 p.m., he responded to a call from Misty Jensen, alleging that a man known to her as "Smoke" had pointed a gun at her in the area of Fourth Avenue and South Street in Leavenworth, Kansas. Upon arriving in the area, Officer Metzgar spoke further with Ms. Jensen.[1] Ms. Jensen initially stated she was in the area to meet Smoke. She then "began to change her story and say that" she was in the area to bring a friend of hers, Donald Torres, to buy crack cocaine and she described a duplex which Officer Metzgar was familiar with as being located at 1811 Fourth Avenue.

Ms. Jensen told Officer Metzgar that when they got to the area, Mr. Torrez got out, made contact with Smoke, then got back in the car and told her to leave in a hurry. Ms. Jensen told Officer Metzgar that two black males then approached her car; one had dark clothing and dreadlocks and the other was Smoke.[2] Ms. Jensen told Officer Metzgar that as she started to leave, Smoke came to the side of her car and pointed a gun at her while the man with dreadlocks pulled Mr. Torrez out of the car. Ms. Jensen said that Smoke and the man with dreadlocks subsequently left the area in a small white four door car with round headlights.

While Officer Metzgar continued talking to Ms. Jensen, Officers Jason Hinkle and Joe Tavano, who were assisting Officer Metzgar, walked towards the duplex described by Ms. Jensen, located at 1811 Fourth Avenue. Officer Metzgar stated the duplex was about a city block from where Ms. Jensen was encountered. A vehicle matching the description given by Ms.

---

[1]Ms. Jensen did not testify at the hearing. Officer Metzgar's testimony regarding what Ms. Jensen told him was admitted, not for the truth of the matter asserted, but to indicate what information the officers had when they approached the residence in question.

[2] Officer Metzgar indicated that neither he nor Ms. Jensen knew Smoke's real name.

Jensen was found parked in the driveway of 1811 Fourth Avenue.  Around 12:10 a.m., the officers decided to make contact with the resident of the duplex to determine why the car was in the driveway and whether Smoke was inside the house.

Officer Metzgar testified that first, Officer Tavano and Officer Brower, who was also present by this time,  secured the perimeter of the residence to prevent individuals from exiting or entering.  Officers Hinkle and Metzgar knocked on the front door several times before it was finally answered by Cecil Newsom.  Mr. Newsom takes 37 pills a day for various conditions and some of those medications make him drowsy; when he answered the door, he had just awakened.  According to Mr. Newsom, he was only wearing boxer shorts when he answered the door and the weather was cool.[3]  He also stated that he was tired and had difficulty standing while talking to the officers.

The officers explained to Mr. Newsom that they were looking for Smoke and asked if he was in the house.  Mr. Newsom replied that the only person in the house was Cynthia Miller Simpson.  The officers asked permission to enter the house and Mr. Newsom said no because Ms. Miller Simpson was sleeping and he would rather not have the officers inside the house.[4]

By this time, Officer Tavano had joined Officers Metzgar and Hinkle at the front door.  Officers Hinkle and Tavano indicated to Mr. Newsom that they noticed the smell of marijuana

---

[3]Officer Metzgar and Sergeant Bridges testified that they could not specifically remember what Mr. Newsom was wearing or the weather.  Because the officers experience frequent encounters like this and Mr. Newsom does not, the court finds Mr. Newsom's testimony regarding these details credible because he is more likely to remember what he was wearing and the weather conditions.

[4]Mr. Newsom testified at the hearing that he did not allow the officers in the house because Ms. Miller Simpson had told him she had warrants out and not to let them in.

coming from the house.  When they asked Mr. Newsom about this, he stated that someone had

been smoking marijuana in his house earlier that day.[5]  According to Mr. Newsom, one of the

officers told him they had already sent for a search warrant, which they would have in about

three or four hours.  He also said the officers mentioned something about "harboring a fugitive."

Sergeant Bridges then arrived on the scene and began to talk to Mr. Newsom.  According

to Sergeant Bridges, he told Mr. Newsom that the officers believed Smoke was in the residence

and they believed he had just committed a serious crime with a gun.  Then, Mr. Newsom

indicated that Smoke was in fact in the residence.  Mr. Newsom volunteered to go back in the

house and bring Smoke out, but as Mr. Newsom started to re-enter the house, Sergeant Bridges

grabbed his arm to stop him.  Sergeant Bridges rejected Mr. Newsom's offer to bring Smoke out

himself because he believed Smoke was armed and he feared a potential hostage situation.

Mr. Newsom testified that he had spoken with the officers for about an hour before he

gave consent and that ten to fifteen officers were present.  However, the court finds the

testimony and documented reports of the officers present more credible.  It is not unusual that

Mr. Newsom, who is not accustomed to encounters with the police, would perceive the exchange

to last much longer and involve many more officers than it actually did. Therefore, the court

concludes that there were four officers present[6] and that about ten minutes after the officers

---

[5]At the suppression hearing, Mr. Newsom was unable to recall this part of his conversation with the officers.

[6]There were a total of five officers on the scene, but the fifth officer, Officer Brower, was securing the outside premises and the facts do not indicate that he was in the front of the house during the discussion with Mr. Newsom.

initially made contact with Mr. Newsom, he gave consent for the officers to enter the residence to search for Smoke.  Mr. Newsom indicated that he let the officers in because he had nothing to hide.

After receiving consent from Mr. Newsom, Sergeant Bridges and Officers Metzgar and Hinkle entered the residence while Mr. Newsom remained outside.  Sergeant Bridges entered first, announcing that they were with the Leavenworth Police Department and ordering anyone in the house to come out with their hands up.  After repeating this several times, Smoke, who was later determined to be Mr. McKinney, came out from the north side of the house and was ordered to the ground and handcuffed by Sergeant Bridges at around 12:19 a.m.[7]  Officers Metzgar and Hinkle continued searching the house for the man with dreadlocks who Ms. Jensen had indicated was with Mr. McKinney.

The officers located Ms. Miller Simpson hiding in the same area of the house that Mr. McKinney had come from; Officer Tavano handcuffed her at 12:21 a.m.  Officers Metzgar and Hinkle then went down to the basement and located Melvin Hayward and a man with dreadlocks later identified as Charles Parker Jr.[8]  Mr. Hayward and Mr. Parker were handcuffed at 12:25 a.m.  After briefly checking the couch in the front room for weapons, the officers allowed Mr.

---

[7]Sergeant Bridges' report from the incident indicated that he did not arrive at the scene until 12:25 a.m, making it impossible for him to have arrested Mr. McKinney at 12:19 as reported by Officer Metzgar.  At the suppression hearing, Sergeant Bridges had no explanation for the discrepancy between the times on his report and the times reported by Officer Metzgar.  In this narrative, the court has used the times contained in Officer Metzgar's reports, finding them consistent with the sequence of events described by Officer Metzgar and Sergeant Bridges.

[8]Mr. Parker initially identified himself as Marvin Parker.

Newsom to re-enter the residence and go back to sleep on the couch.

An affidavit and application for a search warrant for Mr. Newsom's residence at 1811 Fourth Avenue, dated August 16, 2006 at 2:50 a.m., was prepared by Officer William Naff, who received some assistance from Officer Parker. The affidavit contained background information regarding Mr. McKinney's connection to another residence where suspected crack cocaine and marijuana were recovered in February of 2006. The affidavit also contained details of Mr. McKinney's criminal history and the events of May 15, 2006.

The affidavit also contained information from a confidential informant, later identified as Ms. Miller Simpson. The affidavit indicates that Ms. Miller Simpson had been inside the residence at 1811 Fourth Avenue within the last 48 hours and she told officers that in that time, Mr. McKinney had been in the residence with a firearm and a mix of powder cocaine and crack cocaine. Officer Parker testified that although Ms. Miller Simpson hadn't been used by the Leavenworth Police Department in two years, she had been a confidential informant in the past whose information had been reliable.[9]

Judge Robert Bednar, a state district court judge, approved the application and issued the search warrant, which was executed by Officers Naff, Tavano, and Parker. Based on the search warrant issued by Judge Bednar, the officers recovered, among other things, crack cocaine and powder cocaine from the back of a toilet, where Ms. Miller Simpson indicated she had heard

---

[9]The affidavit states Ms. Miller Simpson had provided reliable information approximately twenty times and had participated in approximately seven controlled buys on behalf of the Leavenworth Police Department.

sounds consistent with the toilet lid being lifted, and a Jennings 380 caliber semi-automatic pistol.

Mr. Newsom also testified at the hearing about his relationship with Mr. McKinney. He stated that he has known Mr. McKinney since 2005 and that at one time he allowed Mr. McKinney to store his vehicle at his residence for about six or seven months while Mr. Newsom did some work on it. Mr. McKinney did not have a key to the house, but Mr. Newsom testified that on two or three occasions, after Mr. McKinney had called seeking permission, Mr. Newsom would allow Mr. McKinney to use the residence in Mr. Newsom's absence. Mr. McKinney would come over at least once a month to eat pizza and watch football games or to barbeque chicken or burgers on the grill. Mr. Newsom indicated that in the two years he had known Mr. McKinney, he had spent the night approximately five or six times,[10] the most recent being about four months prior to May 16, 2006. Mr. Newsom testified further that Mr. McKinney did not receive mail at Mr. Newsom's home, did not have a bedroom there, and did not keep any clothes there.

In his suppression motion, Mr. McKinney argues that the searches leading to the evidence seized from Mr. Newsom's residence in May 2006 violated his constitutional rights. Specifically, Mr. McKinney argues that (1) Mr. McKinney had a valid expectation of privacy in Mr. Newsom's residence, (2) the officers' initial search of Mr. Newsom's residence was without voluntary consent, (3) the initial search exceeded any consent given by Mr. Newsom,

---

[10]Mr. Newsom testified that on these occasions, Mr. McKinney would "crash" on his couch in the evening and would still be there when Mr. Newsom awakened at 6:30 or 7:00 in the morning.

and (4) the search warrant was based on an application containing unlawfully obtained and stale information and failed to include information which, if disclosed, would have negated probable cause.   Based on these arguments, Mr. McKinney seeks to suppress the statements made by Ms. Miller Simpson and all evidence obtained from execution of the search warrant.

**II.     Analysis**

*A.     Expectation of Privacy*

The government contends that Mr. McKinney lacked the requisite expectation of privacy necessary to object to the search of Mr. Newsom's residence.   Mr. McKinney argues that his status as a social guest gave him an expectation of privacy in the premises which society recognizes as reasonable.

A defendant's capacity to challenge a search under the Fourth Amendment "refers to whether the party challenging the search or seizure personally has a legitimate expectation of privacy that was implicated by the challenged governmental action." *United States v. Thomas*, 372 F.3d 1173, 1176 (10th Cir. 2004)(citing *Minnesota v. Carter*, 525 U.S. 83, 87-88 (1998)). The court must examine whether the defendant's individual constitutional rights were affected by the police officers' actions. *See United States v. Rubio-Rivera*, 917 F.3d 1271, 1274 (10th Cir. 1990).   To demonstrate that his constitutional rights have been violated, Mr. McKinney must show not only that he had a subjective expectation of privacy in Mr. Newsom's residence, but also that "'society is prepared to recognize that expectation as reasonable.'" *United States v. Higgins*, 282 F.3d 1261, 1270 (10th Cir. 2002)(citing *United States v. Conway*, 73 F.3d 975, 979 (10th Cir. 1995)).

8

Although Mr. McKinney did not permanently live at Mr. Newsom's residence, Mr. Newsom's testimony indicates that the two had known each other for about two years and that Mr. McKinney visited Mr. Newsom socially about once a month to watch ball games or barbeque.  Furthermore, although Mr. McKinney did not have a key or keep any personal belongings at the residence, he had spent the night there about five or six times in the two years prior to the night of the search.  On two or three occasions, Mr. Newsom allowed Mr. McKinney to use the residence in Mr. Newsom's absence.  Mr. McKinney also kept his vehicle in Mr. Newsom's garage and there was no indication that Mr. Newsom received any money in exchange for this.

In support of his argument that he had standing to object to the search as a social guest, Mr. McKinney relies heavily on the Tenth Circuit's opinion in *United States v. Rhiger*, 315 F.3d 1283 (10th Cir. 2003).  The defendant in *Rhiger* had known the homeowner about two weeks, had stayed overnight at the residence three or four times, and on the day of the search had entered the unoccupied residence unannounced to take a nap.  *Id*. at 1286.  A neighbor testified he had seen the defendant's car at the residence for several days and receipts left by the defendant were found in the residence.  *Id*.

The Tenth Circuit began its analysis with the Supreme Court decision in *Minnesota v. Carter*, 525 U.S. 83 (1998), which held that an individual present at another's property for purely commercial reasons has no expectation of privacy to challenge a search of that property.  *Id*. citing *Carter*, 525 U.S. at 90-91.  The Circuit also observed that "the Court pointedly contrasted the status of a guest who has a 'degree of acceptance into the household' from a guest

9

present for 'purely commercial' reasons, noting the former possessed a far greater expectation of privacy in the premises than the latter." *Id*. at 1286 (citing *Carter*, 525 U.S. at 90). The Circuit ultimately concluded that the defendant in *Rhiger* had "'an ongoing and meaningful connection' to [the residence] as a social guest" and therefore had a legitimate expectation of privacy in the residence. *Id*. at 1287.

In this case, the friendship between Mr. McKinney and Mr. Newsom may not be as close as the friendship Mr. Rhiger had with his host. Mr. Rhiger had only known the host two weeks and spent the night at his residence three or four times. In this case, Mr. McKinney stayed the night at Mr. Newsom's residence only five or six times over the course of two years. However, the court does not think the relative "closeness" of the friendship is significant. The question is whether Mr. McKinney was more like one who is present for "purely commercial reasons" or whether he was a guest who had a sufficient "degree of acceptance" in Mr. Newsom's home. Ultimately, the court must determine whether Mr. McKinney, as a social guest, had an "ongoing and meaningful connection to the residence."

This case is different from the purely commercial relationship in *Carter*. 525 U.S. at 83. Although Mr. Newsom worked on Mr. McKinney's car while it was stored at the residence, the facts do not indicate that Mr. Newsom received any significant compensation. Furthermore, similar to the facts in *Rhiger*, Mr. McKinney stayed the night at Mr. Newsom's residence several times and visited him socially quite a few times over the course of their friendship. Although he had to have Mr. Newsom's permission, Mr. Newsom would allow Mr. McKinney to be in the residence when he was not home. All of these facts indicate that Mr. McKinney experienced a

10

"degree of acceptance" in Mr. Newsom's residence.

Based on the Tenth Circuit's reasoning in *Rhiger*, the court concludes that Mr. McKinney had an "ongoing and meaningful connection" to Mr. Newsom's residence. Accordingly, he had a legitimate expectation of privacy in the residence and he has standing to challenge the search of Mr. Newsom's home. Because Mr. McKinney has established that he had a legitimate expectation of privacy in Mr. Newsom's home, the court must go on to determine the validity of Mr. Newsom's consent to the search and whether the officers in this case exceeded the scope of that consent.

B.      *Consent*

Unless the government shows that the initial search of Mr. Newsom's home falls within an exception to the warrant requirement, such as valid consent, it is per se unreasonable under the Fourth Amendment. *See United States v. Sims*, 428 F.3d 945, 952 (10th Cir. 2005)(citing *United States v. Butler*, 966 F.3d 559, 562 (10th Cir. 1992)). Before the court may admit evidence resulting from a search of Mr. Newsom's home, "it must determine from the totality of circumstances that (1) the defendant's consent was voluntary and (2) the search did not exceed the scope of the consent." *United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998). In this case, Mr. McKinney challenges both the voluntariness of Mr. Newsom's consent and the scope of the search.

1.      Voluntariness of Consent

In examining the issue of consent, the Circuit has advised that "[v]alid consent is that which is 'freely and voluntarily given.' Whether a defendant freely and voluntarily gave his

11

consent to a search is a question of fact and is determined from the totality of the circumstances." *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (internal citations omitted). To establish that Mr. Newsom gave valid consent, the government must: "(1) proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given; and (2) prove that this consent was given without implied or express duress or coercion." *Id*.

The following factors are to be considered when evaluating whether Mr. Newsom's consent was given freely and voluntarily: physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, an aggressive tone, Mr. Newsom's physical and mental condition and capacity, the number of officers present, and the display of police weapons. *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006)(citing *Pena*, 143 F.3d at 1367 and *United States v. Rosborough*, 366 F.3d 1145. 1149 (10th Cir. 2004)).  Whether Mr. Newsom was informed of his right to refuse consent is also one factor to be considered.  *Id*. (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).

There were four officers present when Mr. Newsom consented, and all were dressed in uniform and were armed with police weapons.  Arguably, there was a degree of physical discomfort, considering Mr. Newsom's testimony that he had only boxers on and it was cold outside.   Additionally, Mr. Newsom's physical and mental condition and capacity were somewhat impaired due to the fatigue caused by his medications.

None of the officers at the hearing testified that they informed Mr. Newsom of his right to refuse consent.  However, this alone does not establish that Mr. Newsom's consent was involuntary. *Schneckloth*, 412 U.S. at 249 (("[W]hile the subject's knowledge of a right to refuse

12

is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.").

Furthermore, the officers' statements about obtaining a search warrant do not preclude a finding that Mr. Newsom's consent was voluntary.  The Tenth Circuit has stated that "where some basis exists to support an application for a search warrant, an officer's expressed intention to seek a search warrant in the absence of consent does not render a consent involuntary." *United States v. Creech*, 221 F.3d 1353, 2000 WL 1014868, at *2 (10th Cir. 2000)(unpublished opinion)[11] (citing *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992) (holding that where officer's expressed intention to obtain a search warrant was genuine and not merely a pretext to induce submission, such intention did not vitiate consent)).  The court finds the officers' statements regarding the search warrant legitimate in light of the information obtained from Ms. Jensen.

Similarly, the officers' statements about smelling marijuana and harboring a fugitive do not render Mr. Newsom's consent involuntary.  *See United States v. Miles*, 16 Fed. Appx. 845, 2001 WL 815379, at *3 (10th Cir. 2001)(unpublished opinion)[12] (finding that an officer who truthfully informed an individual that she could be arrested for harboring a fugitive did "not rise to the level of coercion or duress necessary to negate consent.").  There is no indication that these statements were  baseless or merely a pretext to coerce Mr. Newsom.  *See id*. ("[T]he

[11]The court is citing this unpublished case for its persuasive value on a material issue in this case.

[12]The court is citing this unpublished case for its persuasive value on a material issue in this case.

13

officer's statement did not relate to [the homeowner's] refusal to consent to the search, but only to her statements that [the defendant] was not in the apartment.  The officers never threatened to punish [the homeowner] for refusing to consent, they merely advised her that harboring a fugitive was itself a crime, for which she could be arrested.").  Therefore, the court concludes there was no evidence that the officers used violence, threats, promises, inducements, deception, trickery, or an aggressive tone with Mr. Newsom.

Although certain factors surrounding Mr. Newsom's consent point in the other direction, the court finds his consent was given voluntarily.  Perhaps the most important factor is that Mr. Newsom himself testified at the hearing about his consent and stated that he let the officers in because he had nothing to hide.  No evidence was presented to suggest that Mr. Newsom did not think his consent was voluntary.  Mr. Newsom never stated that he was coerced into consenting or that his consent was not voluntary, nor did he state that he consented to the search because of the officers' actions.  Mr. McKinney's attorney suggested in argument that Mr. Newsom acquiesced to the officers' request after being told that a search warrant would take three to four hours, thinking he would have to sit outside and wait that long. However, Mr. Newsom never stated this was his thinking or reasoning. The absence of such testimony by Mr. Newsom is highly suggestive that, all in all, he freely consented to allowing the officers inside his house to search for Mr. McKinney and that is the finding of the court.

2.      Scope of Consent

Mr. McKinney argues that even if Mr. Newsom's consent was given freely and voluntarily, the officers exceeded the scope of that consent because Mr. Newsom allowed them

in the house to search for Mr. McKinney only.  Therefore, the officers should have stopped the search as soon as they found Mr. McKinney, and any evidence obtained after that time should be suppressed.  Specifically, Mr. McKinney seeks to suppress the statements made by Ms. Miller Simpson after she was found and arrested in the home.  The government argues that the officers' were justified in continuing to search for the other occupants because they had a right to conduct a protective sweep of Mr. Newsom's residence.

"A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."  *Id*. at 327.  "Such a search is limited to a 'cursory visual inspection of those places in which a person might be hiding.'"  *United States v. Cavely*, 318 F.3d 987, 995 (10th Cir. 2003) (quoting *Buie*, 494 U.S. at 327).  The Fourth Amendment permits a protective sweep when officers "'possess[ ] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ ] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others."  *United States v. Torres-Castro*, 470 F.3d 992, 996 (10th Cir. 2006)(quoting *Buie*, 494 U.S. at 327).  Protective sweeps are only permitted incident to an arrest. *See id*.

In this case, the government's evidence demonstrates that law enforcement officials had specific and articulable facts justifying the protective sweep.  First, the officers knew that Ms. Miller Simpson was in the house, and she did not appear when they announced their presence and ordered the occupants to come out.  Second, Ms. Jensen indicated to the officers that Mr. McKinney had a gun, but there was no evidence of a gun being found on him after he was

arrested.  Third, Ms. Jensen also indicated that Mr. McKinney was with another person when he pointed the gun at her and that person was still unaccounted for after the officers found Mr. McKinney.

The court finds these facts sufficient to give the officers a reasonable suspicion that there was at least one or more people in the house who could pose a danger to those on the arrest scene.  Furthermore, there is no indication in the facts that the officers performed more than a "cursory visual inspection of those places in which a person might be hiding." The three other occupants were located rather quickly and the entire entry, search, and arrest of the four individuals took approximately six minutes.  Accordingly, the court finds the officers did not exceed the scope of the consent given by Mr. Newsom in this case and their search was valid under the Fourth Amendment. Therefore, the court will not suppress the information obtained from Ms. Miller Simpson as a result of that search.

C.    *The Warrant*

Mr. McKinney does not argue that the affidavit upon which the search warrant was based was facially insufficient for Judge Bednar's finding of probable cause.  Rather, he argues that the background information contained in the affidavit was stale and the information from Ms. Miller Simpson constituted fruit of the poisonous tree.  Mr. McKinney contends that without the tainted information, Judge Bednar would have lacked probable cause to issue the warrant.  Mr. McKinney also argues that the search warrant should be found invalid due to Officer Naff's failure to include information indicating that Ms. Jensen had changed her story while talking to the officers and that Ms. Miller Simpson had outstanding warrants and was hiding in the

residence.[13]

In reviewing Judge Bednar's decision to issue a search warrant, the court must determine whether he had a "substantial basis" for the conclusion that probable cause existed. *United States v. Edmonson*, 962 F.2d 1535, 1540 (10th Cir. 1992). Furthermore, the issuing judge's probable cause determination is given great deference. *Illinois v. Gates*, 462 U.S. 213, 236 (1983).

As stated above, the statements obtained from Ms. Miller Simpson did not violate the Fourth Amendment because Mr. Newsom's consent was voluntary and the officers' protective sweep was valid. Accordingly, the court rejects Mr. McKinney's argument that the affidavit contained information constituting fruit of the poisonous tree.

The affidavit stated that the officers learned from Ms. Miller Simpson that Mr. McKinney was inside the residence located at 1811 Fourth Avenue with narcotics and a small handgun.[14] The affidavit also stated that Ms. Miller Simpson had proven a reliable informant over the past two years and that she had participated in approximately seven controlled buys. This information alone was more than enough to form a sufficient basis for Judge Bednar's conclusion that probable cause existed, notwithstanding the allegedly stale information. Therefore, the court finds irrelevant Mr. McKinney's argument that the background information

---

[13] Mr. McKinney offers no specific support for this argument and the court finds that the omission of this information does not negate its finding that probable cause existed justifying the issuance of the warrant.

[14] The officers obtained this information from Ms. Miller Simpson after she was arrested inside the residence.

in the affidavit was stale.

### III.    Conclusion

In sum, although the court finds that Mr. McKinney has standing to contest the search in this case, it denies his motions to suppress.  Mr. Newsom's consent was voluntary and the officers did not exceed the scope of that consent because their search constituted a protective sweep of the premises.  Therefore, the information obtained as a result of that search did not violate the Fourth Amendment and was validly included in the affidavit and application for the search warrant.  Consequently, Judge Bednar had a substantial basis to find probable cause justifying the issuance of the search warrant in this case.

**IT IS THEREFORE ORDERED BY THE COURT** that the defendant's motion to suppress evidence (doc. 25) and amended motion to suppress evidence (doc. 27) are denied.

**IT IS SO ORDERED.**

Dated this 17th  day of January, 2007.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

18